UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Douglas Hiram Coleman,

        Plaintiff,

vs.

Duluth Police Department;
Chief Gordon Ramsay; Officer
Tinsley and other unidentified
Duluth Police Officers, both
individually and in their official
capacity; and Fond Du Luth
Casino-Security; Unidentified
Security Officers, both individually
and in their official capacity; Jim
Urness, Manager/Chief  of Security,
both individually and in his official
capacity,

        Defendants.        Civ. No. 07-473 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Defendants' Motions to Dismiss or for Summary Judgment, and the Plaintiff's Motion for Entry of Default, and Motion to Appoint Counsel.[1]  See, <u>Docket Nos. 95, 108, 131, 132</u>.

For these purposes, the Plaintiff appears <u>pro se</u>; the Defendants City of Duluth, Duluth Police Chief Gordon Ramsay ("Ramsay"), Officer Ron Tinsley ("Tinsley"), Officer Hanson ("Hanson"), and Officer William Helgemoe ("Helgemoe")(collectively "the Duluth Defendants") appear by M. Alison Lutterman, Assistant City Attorney;  and the Defendants Jim Urness ("Urness"), Ron Castellini ("Castellini"), David Johnson ("Johnson"), and Darrell Olson, also known as "Ole" ("Olson")(collectively, "the Casino Defendants"), appear by Dennis J. Peterson, Esq.

For reasons which follow, we recommend that the Defendants' Motions be granted, and that the Plaintiff's Motions be denied.

## II.  <u>Factual and Procedural History</u>

The Plaintiff contends that the Defendants violated his Fourth, Sixth, Eighth, and Fourteenth Amendment rights, through the course of several arrests, and by

---

[1]The Plaintiff has also filed a Motion to Dismiss, see <u>Docket No. 116</u>, which we construe as a response to the Defendants' Motions to Dismiss.  See, <u>Order</u>, <u>Docket No. 118</u>, at 1.

ejecting him from the Fond-du-Luth Casino ("the Casino"). See, Amended Complaint, Docket No. 63, at 2-14.

With respect to the Plaintiff's several arrests, on June 15, 1999, the Plaintiff was stopped by a Duluth Police Officer on account of a cracked rear taillight. See, Amended Complaint, supra at 5. The Plaintiff alleges that the police officer informed him that he had an outstanding Warrant. Id. Accordingly, the Plaintiff was arrested, and was taken to the St. Louis County Jail, and as a result of his arrest, his vehicle was towed. Id. The Plaintiff was released from the St. Louis County Jail approximately one (1) hour later, after the officers discovered that he had no active Warrants. Id. The Plaintiff alleges that his arrest was made without probable cause. Id.

Several years later, on January 5, 2003, Officer Wilson ("Wilson"), who is a Duluth Police Officer, issued the Plaintiff a citation for driving over the center line. Id. The Plaintiff was later convicted of that criminal charge. See, Affidavit of James Lesar ("Lesar Aff."), Docket No. 98, Exhibit A. Two (2) days later, on January 7, 2003, Wilson conducted another traffic stop of the Plaintiff. See, Amended Complaint, supra at 6. During the course of that traffic stop, the Plaintiff was arrested and charged with a felony, owing to his failure to comply with the police, and with a misdemeanor, for failing to provide proof of insurance. See, Affidavit of M. Alison

Lutterman ("Lutterman Aff."), Docket No. 97, Exhibit 1 at 1-3.  On April 23, 2003, the Plaintiff pled guilty to both charges.  Id. at 3.  Thereafter, on August 22, 2003, the Plaintiff's driving privileges were revoked for his failure to provide proof of insurance, and two (2) years later, on December 26, 2005, the Plaintiff was convicted of driving after the withdrawal of driving privileges.  See, Lesar Aff., supra, Exhibit A.  On March 28, 2006, as a result of the Plaintiff's conviction, the State of Minnesota suspended his driving privileges.  Id.  The Plaintiff alleges that those citations, and arrests, were made without probable cause.  See, Amended Complaint, supra at 5-6.

Later that year, on September 20, 2006, at 2:19 o'clock a.m., Duluth Police Officers responded to a private citizen's report of a near accident, outside of Curley's Bar, in Duluth, Minnesota.  See, Affidavit of Kevin Tomlin ("Tomlin Aff."), Docket No. 99, at ¶2.  The officers went to the Little Store gas station, which is located in Duluth, Minnesota, in search of a grey Ford pickup ("the pickup"), that was the subject of the private citizen's complaint.  Id.  Kevin Tomlin ("Tomlin"), who is a Duluth Police Officer, found the pickup at the Little Store gas pumps.  Id., Exhibit A.  The Plaintiff was pumping gas into the pickup, when Tomlin approached, and asked the Plaintiff for his driver's license.  Id., Exhibit A at 1-2.  The Plaintiff stopped

pumping gas, but he was unable to find either his wallet, or his driver's license.  Id.

Exhibit A at 2.  When the Plaintiff was searching for his driver's license, two (2) other

Duluth Police Officers arrived at the Little Store.  Id.

While talking to the Plaintiff, Tomlin smelled alcohol on the Plaintiff's breath,

and Tomlin asked the Plaintiff if he had been drinking that night.  Id.  The Plaintiff

admitted that he had and, at Tomlin's request, the Plaintiff agreed to perform a

preliminary breath test ("PBT").[2]  Id.  Although the Plaintiff had agreed to take the

PBT, he would not blow into the device in the proper manner, and as a result, the PBT

would not register a valid result.  Id.  After two (2) attempts, Tomlin told the Plaintiff

that he would give him one (1) more opportunity to perform the PBT properly, or he

would be placed under arrest for driving while intoxicated.  Id.  When the Plaintiff

again failed to perform the PBT as directed, he was placed under arrest.  Id.  After the

Plaintiff was placed in the rear of Tomlin's squad car, he became very upset, and

began to kick the rear window.  Id. at 3.  Tomlin asked the Plaintiff to stop kicking,

and the Plaintiff briefly complied before he began to kick the side window and shout

obscenities at the police officers.  Id.

---

[2]Tomlin also observed that the Plaintiff was experiencing wild mood swings, where for one moment he would be calm and cooperative, and at the next moment, he was angry and using obscenities.  See, Tomlin Aff., supra, Exhibit A at 2.

Since the Plaintiff was being transported to the police station, his pickup was towed from the Little Store. Id. at ¶¶2-3. At the police station, Tomlin read the Minnesota Implied Consent Advisory aloud to the Plaintiff, but the Plaintiff stated that he did not understand the Advisory.[3] Id., Exhibit A at 3. The Plaintiff asked to speak with an attorney, and a telephone was provided to him. Id. The Plaintiff called directory assistance, received a number, and made one (1) telephone call, but he told Tomlin that the call failed to connect. Id. The Plaintiff then stated that he did not need an attorney and, when Tomlin asked him to take another breath test, the Plaintiff again consented. Id. The Plaintiff provided two (2) samples that registered a value of .06 blood alcohol content, which is under the legal limit. Id. Since the Plaintiff was under the legal limit, he was only cited for driving after revocation, and careless driving. Id. Tomlin then offered the Plaintiff a ride, which the Plaintiff accepted. Id. Tomlin transported the Plaintiff to the area surrounding St. Luke's Hospital ("St. Luke's"), in Duluth, Minnesota. Id. The Plaintiff alleges that that arrest was unlawful. See, Amended Complaint, supra at 3-4.

The Plaintiff then walked to his residence, but he realized that he could not get into his residence because his keys were in his pickup, which had been towed by the

---

[3]See, Minnesota Statutes Section 169A.51, Subdivision 2(1-4).

police.  Id. at 7.  The Plaintiff decided to sleep on a bench in an area known as the "Rose Garden," approximately one-half block from his residence.      Id.  At approximately 2:00 o'clock a.m., the Plaintiff woke up, and decided to head to the Casino.[4]  Id.  The Plaintiff entered the Casino, but was stopped by Johnson, who is a Casino security guard.  See, Casino Video Surveillance, Docket No. 10, Exhibit E at 2:01. The Plaintiff informed Johnson that he needed to make a telephone call, but Johnson was informed over the radio, by another security guard, that the Plaintiff was not allowed in the Casino.  See, Amended Complaint, supra at 7.  After the Plaintiff and Johnson exchanged words, the Plaintiff left the Casino.  See, Casino Video Surveillance, supra, Exhibit E at 2:01.

At approximately 2:03 o'clock a.m., the Plaintiff re-entered the Casino, and Johnson immediately asked him to leave.  See, Casino Defendants' Memorandum in Support, Docket No. 112, Exhibit C at 1. The Plaintiff tried to move past Johnson but, when that proved to be unsuccessful, he began to physically threaten Johnson.  See, Casino Video Surveillance, supra, Exhibit E at 2:03; Casino Defendants'

---

[4]Some years earlier, the Plaintiff was involved in numerous altercations at the Casino, and on January 21, 2000, the Plaintiff was permanently banned from the Casino by the Board of Directors of Fond du Lac Management, Inc.  See, Casino Defendants' Memorandum in Support, supra, Exhibit A.

Memorandum in Support, supra, Exhibit C at 1.  In response to the Plaintiff's behavior, Johnson requested assistance from other Casino security guards.  See, Casino Video Surveillance, supra, Exhibit E at 2:03; Casino Defendants' Memorandum in Support, supra, Exhibit C at 1.

At approximately 2:03 o'clock a.m., an emergency call was made, by the Casino staff, to the Duluth Police Department.   See, Casino Defendants' Memorandum in Support, supra, Exhibit C at 2.  The Plaintiff left the Casino, while being followed by Johnson and the other security guards, including Castellini, and Olson.  See, Casino Video Surveillance, supra, Exhibit E at 2:04; Casino Defendants' Memorandum in Support, supra, Exhibit C at 1.  As the Plaintiff and Johnson reached the exterior of the Casino, the Plaintiff again physically threatened Johnson.  See, Casino Video Surveillance, supra, Exhibit E at 2:04; Casino Defendants' Memorandum in Support, supra, Exhibit C at 2.  Johnson reached for the Plaintiff, and with the help of Castellini and Olson, he forced the Plaintiff to the sidewalk.  See, Casino Video Surveillance, supra, Exhibit E at 2:04; Casino Defendants' Memorandum in Support, supra, Exhibit C at 1-2. The Plaintiff continued to struggle on the ground, but the security guards kept him pinned to the ground.  See, Casino Video Surveillance, supra, Exhibit E at 2:04-2:06; Casino Defendants' Memorandum

in Support, supra, Exhibit C at 1-2.  The Plaintiff alleges that the Casino Defendants violated his Fourth Amendment rights, by ejecting him from the Casino, and by using excessive force to restrain him.  See, Amended Complaint, supra at 7-8.

At approximately 2:06 o'clock a.m., Helgemoe, who is a Duluth Police Officer, arrived at the scene.  See, Casino Defendants' Memorandum in Support, supra, Exhibit C at 1-2.  Helgemoe observed that the Plaintiff was pinned to the sidewalk, that the Plaintiff was yelling that he was a gangster, that he was going to take security out, and that there was no reason to bar him from the Casino.  See, Affidavit of William Helgemoe ("Helgemoe Aff."), Docket No. 100, Exhibit A at 1.  Helgemoe placed the Plaintiff in handcuffs, stood him up, searched him, and put him in the rear of his squad car.  Id.  Shortly thereafter, Tinsley, who is also a Duluth Police Officer, arrived on the scene.  See, Affidavit of Ronald Tinsley ("Tinsley Aff."), Docket No. 101, at ¶2.  The security guards told Helgemoe that the Plaintiff had been asked to leave the Casino and that, when he refused, they forcibly removed him.  See, Helgemoe Aff., supra, Exhibit A at 1.  As the Plaintiff sat in the back of Helgemoe's squad car, he became agitated and incoherent.  Id.  Helgemoe wanted to take the Plaintiff to jail but, after speaking with another officer, he decided to take the Plaintiff

to St. Luke's for a mental evaluation, and Tinsley decided to accompany him.  See, <u>Helgemoe Aff.</u>, supra, Exhibit A at 1; <u>Tinsley Aff.</u>, supra at ¶¶2-3.

The Plaintiff was transported to St. Luke's, where he continued to be highly agitated.  See, <u>Helgemoe Aff.</u>, supra, Exhibit A at 1.  After the Plaintiff was admitted to St. Luke's, his handcuffs were removed but, once again, he became combative, and he was placed back into handcuffs.  See, <u>Tinsley Aff.</u>, supra at ¶3.  At another point, the Plaintiff had to be physically restrained on a bed in order to prevent him from harming himself and others.  See, <u>Helgemoe Aff.</u>, supra, Exhibit A at 1.  Eventually, the Plaintiff calmed down, and the officers were finally able to remove his handcuffs. <u>Id.</u>  A doctor informed the Plaintiff that he would be kept until the morning for a mental evaluation, and that he could speak with his primary doctor in the morning. <u>Id.</u>  Helgemoe issued citations to the Plaintiff for Obstructing a Public Officer, and for Trespass on Private Property but, when Helgemoe attempted to explain the citations, the Plaintiff became agitated.[5]  <u>Id.</u> at 2.

Helgemoe then decided to place a copy of the citations in the Plaintiff's pocket. <u>Id.</u> at 2. The Plaintiff was released to the custody of St. Luke's, and Helgemoe and

---

[5]On May 30, 2007, after a Bench Trial, the Plaintiff was convicted of Obstructing a Peace Officer, and Trespassing on Private Property.  See, <u>Lutterman Aff.</u>, supra, Exhibit 2.

Tinsley left the hospital.  Id.  Based upon Helgemoe and Tinsley's conduct, the Plaintiff alleges that they violated his Fourth Amendment rights, because they arrested him without probable cause, and because he alleges that they directed St. Luke's staff to perform a blood draw without his consent.  See, Amended Complaint, supra at 9. He also alleges that Tinsley physically and verbally harassed him, when St. Luke's staff were absent, and that Tinsley and Helgemoe were negligent for not ensuring that he received proper medical care.  Id. at 8-9.

More than six (6) months later, on April 26, 2007, David Drozdowski ("Drozdowski"), and Erik Hanson ("Hanson"), who are both Duluth Police Officers, were dispatched to St. Mary's Hospital ("St. Mary's"), based on a report of an unwanted individual on the premises.  See, Affidavit of David Drozdowski ("Drozdowski Aff."), Docket No. 102, Exhibit A at 1. The officers arrived at approximately 8:04 o'clock a.m., and were directed to a bathroom.  Id.  As Drozdowski looked inside the bathroom, he observed the Plaintiff yelling at six (6) security guards.  Id. Hanson entered the bathroom, and escorted the Plaintiff into the hallway.  Id.  The officers explained to the Plaintiff that he was trespassing on St.

Mary's property.[6] Id.  The Plaintiff stated that he had come to the St. Mary's chapel

to pray, and that he had been informed that he was banned from the property.  Id.

Hanson then handcuffed the Plaintiff, and searched his person.  Id., Exhibit A

at 2.  Hanson found a bullet in the Plaintiff's pocket, and the Plaintiff stated that he

had a bullet because he had a gun, but he would not tell the officers where the gun was

located.[7] Id.  Hanson also found a pocketknife on the Plaintiff's person, although the

firearm was never located.[8] Id.

As Hanson continued his search, some loose change fell out of the Plaintiff's

pocket.  Id.  Hanson moved the Plaintiff a few feet into the hallway, and asked him to

turn around, in order to allow Hanson to pick up the loose change without exposing

himself to a possible assault by the Plaintiff.  Id.  When the Plaintiff refused to turn

around, Hanson tried to physically turn the Plaintiff, but he was unsuccessful.  Id.  At

_____

[6]According to Drozdowski's police report, the Plaintiff had previously "received a letter that he was trespassed from all of St. Mary's properties."  See, Drozdowski Aff., supra, Exhibit A at 1.  From the context of the report, we understand "trespassed" to mean that the Plaintiff was prohibited from entering upon St. Mary's properties.

[7]During this interaction, the Plaintiff was verbally uncooperative, and he spoke in a raised voice.  See, Drozdowski Aff., supra, Exhibit A at 2.

[8]Drozdowski took the Plaintiff's pocketknife, and placed it with the Plaintiff's property at the St. Louis County Jail.  See, Drozdowski Aff., supra, Exhibit A at 2.

that point, Drozdowski took hold of the Plaintiff's upper body, and moved the Plaintiff to a nearby wall so as to restrain him.  Id.  The Plaintiff resisted, but two (2) of St. Mary's security guards helped Drozdowski restrain the Plaintiff.  Id.  When the Plaintiff tried to turn his head back towards the group, Drozdowski restrained the Plaintiff's head against the wall.  Id.

The Plaintiff was eventually removed from the wall, but he remained combative.  Id.  Accordingly, Drozdowski used a wrist lock to move the Plaintiff out of the building.  Id.  As they approached the squad car, the Plaintiff had to be restrained against the trunk while the rear door was opened.  Id.  Drozdowski transported the Plaintiff to the St. Louis County Jail, where he was held on charges of Obstructing Legal Process and Trespassing.[9]  Id.  At the intake area of the St. Louis County Jail, the Plaintiff stated that he wanted to file assault charges against Drozdowski, and he was informed that he could file charges at a later time.  Id.  The Plaintiff did not complain of any injuries.  Id.  However, the Plaintiff contends that Hanson directed the intake officer not to release the Plaintiff until after 6:00 o'clock p.m.  See, Amended Complaint, supra at 11.  Based upon Drozdowski's and Hanson's

---

[9]Ultimately, the charge for Obstructing the Legal Process was dismissed but, on October 10, 2007, after a Bench Trial, the Plaintiff was convicted of Trespass.  See, Lutterman Aff., supra, Exhibit 3.

conduct, the Plaintiff alleges that they violated his Fourth Amendment rights by their use of excessive force in securing his arrest, and that Drozdowski violated his Due Process rights when he ordered the Plaintiff not to be released until after 6:00 o'clock p.m..[10]  See, Amended Complaint, supra at 11.

The Plaintiff also contends that, sometime in May of 2003, Urness discriminated against him in the Plaintiff's attempt to secure employment with the Fond du Lac Band of the Lake Superior Chippewa ("the Band").  Id. at 13-14.

The Duluth Defendants now seek dismissals of the Plaintiff's claims against Ramsay, based upon the Plaintiff's failure to state a claim.  See, Rule 12(b)(6), Federal Rules of Civil Procedure.  In addition, the Duluth Defendants seek Summary Judgment as to the Plaintiff's remaining claims under the rule announced in Heck v.

---

[10]Lastly, in his Amended Complaint, the Plaintiff has raised a claim relating to Officer Jones ("Jones"), who is a police officer with the Duluth Police Department, and who stopped him on the street, issued him a ticket for disorderly conduct ,and had his bicycle confiscated without providing an inventory slip. Id. at 10. We previously concluded that this claim was futile, see, Order, Docket No. 57, at 23, and accordingly, we do not address the claim further.

In addition, the Plaintiff's Amended Complaint contains a section entitled "Statistical Analysis." See, Amended Complaint, supra at 10. We agree with the Duluth Defendants, that this section of the Plaintiff's Amended Complaint fails to state any cognizable claim.

Humphrey, 512 U.S. 477 (1994), and on the bases of the applicable statute of limitations, and the doctrine of qualified immunity.[11]   See, Duluth Defendants' Memorandum in Support, supra at 6-34.

The Casino Defendants also filed a Motion to Dismiss, based upon a lack of subject matter jurisdiction, as well as the Plaintiff's failure to state a claim.  See, Rule 12(b)(1) and (b)(6), Federal Rules of Civil Procedure.   Alternatively, the Casino Defendants argue that the Plaintiff's claims are barred by Tribal sovereign immunity, and by the Plaintiff's failure to exhaust Tribal Court remedies.   See, Casino Defendants' Memorandum in Support, supra at 4-14.

---

[11]In their Memorandum, the Duluth Defendants argue that we are without personal jurisdiction over Helgemoe, Hanson, and Jones, because the Plaintiff  has failed to effect service of process upon them.  See, Duluth Defendants' Memorandum in Support, supra at 26.  However, they have not expressly asserted personal jurisdiction as a defense in their Motion to Dismiss, pursuant to Rule 12(b)(2), Federal Rules of Civil Procedure and therefore, we conclude the defense is waived.  See, Rule 12(h)(1)(B)(i-ii), Federal Rules of Civil Procedure, (A defense for lack of personal jurisdiction is waived by "failing to either * * * make it by motion under this rule; or * * * include it in a responsive pleading [.]"); Yeldell v. Tutt, 913 F.2d 533, 539 (8th Cir. 1990)("[T]he defense of lack of personal jurisdiction is waived if not made by motion or included in a responsive pleading."); Alger v. Hayes, 452 F.2d 841, 844 (8th Cir. 1972); Network Professionals, Inc. v. Network Inter. Ltd., 146 F.R.D. 179, 181 (D. Minn. 1993)("[T]he defense [for lack of personal jurisdiction] may be waived if it is neither raised by motion before the answer or asserted in a responsive pleading.")[citations omitted].  Accordingly, we address the merits of the  Plaintiff's claims against those Defendants.

In turn, the Plaintiff seeks the Entry of Default against the Casino Defendants, as well as the appointment of legal counsel.  We consider the parties' arguments in turn.

## III.  <u>Discussion</u>

A.      <u>Standard of Review.</u>  A party may challenge a Court's subject matter jurisdiction at any time, under Rule 12(b)(1), Federal Rules of Civil Procedure, since such a defense may not be waived.  See, <u>Moubry v. Independent School District No. 696</u>, 951 F. Supp. 867, 882 (D. Minn. 1996), citing <u>Northwest Airlines, Inc. v. Transport Workers</u>, 451 U.S. 77, 95 (1981); <u>Bueford v. Resolution Trust Corp.</u>, 991 F.2d 481, 485 (8th Cir. 1993)("Lack of subject matter jurisdiction * * * cannot be waived[;] [it] may be raised at any time by a party to an action, or by the court <u>sua sponte</u>.").  "In order to properly dismiss an action under Rule 12(b)(1), the challenging party must successfully attack the Complaint, either upon its face or upon the factual truthfulness of its averments."  <u>Moubry v. Independent School Dist. No. 696</u>, supra at 882, citing <u>Titus v. Sullivan</u>, 4 F.3d 590, 593 (8th Cir. 1993); <u>Osborn v. United States</u>, 918 F.2d 724, 729 n. 6 (8th Cir. 1990).

If the defendant brings a facial challenge -- a challenge that, even if truthful, the facts alleged in a Complaint are insufficient to establish jurisdiction -- the Court

- 16 -

reviews the pleadings alone, and "the non-moving party [is afforded] the same protections that it would receive under a Rule 12(b)(6) motion to dismiss." <u>Carlson Holdings, Inc. v. NAFCO Ins. Co.</u>, 205 F. Supp.2d 1069, 1073 (D. Minn. 2001), citing <u>Titus v. Sullivan</u>, supra at 593; <u>Osborn v. United States</u>, supra at 729 n. 6. Accordingly, "[t]he court presumes that all of the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential element for subject matter jurisdiction." <u>Id.</u>

However, in factual challenges to subject matter jurisdiction -- contending that the allegations in the Complaint, that are to establish jurisdiction, are insufficiently supported by the facts -- the Court "may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6)." <u>Id.</u>  When a plaintiff's "'allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof," "[a]nd * * * for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence.'" <u>Zunamon v. Brown</u>, 418 F.2d 883, 886 (8th Cir. 1969), quoting <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936).

Further, when reviewing a Rule 12(b)(6) dismissal for failure to state a claim, we look only to the facts alleged in the complaint and "construe those facts in the light most favorable to the [nonmoving party]." <u>Riley v. St. Louis County</u>, 153 F.3d 627, 629 (8th Cir. 1998), cert. denied, 525 U.S. 1178 (1999), citing <u>Double D Spotting Serv., Inc. v. Supervalu, Inc.</u>, 136 F.23d 554, 556 (8th Cir. 1998); see also, <u>Maki v. Allete, Inc.</u>, 383 F.3d 740, 742 (8th Cir. 2004).  In addition, all reasonable inferences, from the facts alleged in the Complaint, must also be drawn in favor of the nonmoving party.  See, <u>Maki v. Allete, Inc.</u>, supra at 742.  "A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief."[12]  <u>Young v. City of St. Charles</u>, 244 F.3d 623, 627 (8th Cir. 2001), citing <u>Breedlove v. Earthgrains Baking</u>, 140 F.3d 797, 799 (8th Cir. 1998); see

---

[12]We recognize that the "no set of facts" standard, in reviewing Motions to Dismiss, was abrogated by the Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955, 1969 (2007)(the standard in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), of "no set of facts" "has earned its retirement.").  Nevertheless, the abrogation did not change the Court's "accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  <u>Id.</u> at 1960.  Here, we apply the Supreme Court's "accepted pleading standard."

also, <u>Maki v. Allete</u>, supra at 742; <u>Helleloid v. Independent School Dist. No. 361</u>, 149

F. Supp. 2d 863, 866-67 (D. Minn. 2001).

"Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which

are fatally flawed in their legal premises and designed to fail, thereby sparing litigants

the burden of unnecessary pretrial and trial activity." <u>Young v. City of St. Charles</u>,

supra at 627, citing <u>Neitzke v. Williams</u>, 490 U.S. 319, 326-27 (1989). "To avoid

dismissal, a complaint must allege facts sufficient to state a claim as a matter of law

and not merely legal conclusions." <u>Id.</u>, citing <u>Springdale Educ. Ass'n v. Springdale</u>

<u>Sch. Dist.</u>, 133 F.3d 649, 651 (8th Cir. 1998); see also, <u>Bell Atlantic Corp. v.</u>

<u>Twombly</u>, 550 U.S. 544,127 S.Ct. 1955, 1964-65 (2007)("While a complaint attacked

by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a

plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do.").

A Motion to Dismiss can be converted to a Rule 56 Motion for Summary

Judgment if "matters outside the pleadings are presented to and not excluded by the

court." <u>Rule 12(b), Federal Rules of Civil Procedure</u>. However, a Court may consider

some information, which is not contained within the Complaint -- such as materials

that are part of the public record, and materials that are necessarily embraced by the

pleadings -- without transforming the Motion into one for Summary Judgment.  See,

Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999); see also,

Enervations, Inc. v. Minnesota Mining and Manufacturing Co., 380 F.3d 1066, 1069

(8th Cir. 2004); Stahl v. United States Department of Agriculture, 327 F.3d 697, 700

(8th Cir. 2003).  Since part of our decision rests entirely upon the pleadings, materials

within the public record, and materials that are necessarily embraced by the pleadings,

we analyze the Plaintiff's claims against  Ramsay and the Casino Defendants under

the framework of Rules 12(b)(1) and 12(b)(6), rather than Rule 56.  However, since

we have considered the Duluth Defendants' evidentiary submissions with regard to

the Plaintiff's other claims, we construe the Duluth Defendants' Motion as one for

Summary Judgment.

Summary Judgment is not an acceptable means of resolving triable issues, nor

is it a disfavored procedural shortcut when there are no issues which require the

unique proficiencies of a Jury in weighing the evidence, and in rendering credibility

determinations.  See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Midwest

Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 711 (8th Cir. 2004), cert.

denied, 544 U.S. 977, 125 S.Ct. 1860 (2005).  Summary Judgment is appropriate

when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, Eide v. Grey Fox Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003); United Fire & Casualty Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003).  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the nonmoving party.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Planned Parenthood of Minnesota/ South Dakota v. Rounds, 372 F.3d 969, 972 (8th Cir. 2004); Fenney v. Dakota, Minnesota & Eastern R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v.

- 21 -

City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).  Moreover, the movant

is entitled to Summary Judgment where the nonmoving party has failed "to establish

the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  Celotex Corp. v. Catrett, supra at 322; see also,

Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar

Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center,

Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine issue of fact exists in such a case

because "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp.

v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474

(8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber

and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

With these precepts in mind, we turn to the parties' arguments.

B.   Legal Analysis.  Since the Plaintiff's claims against the Defendants

implicate some different considerations, we address their Motions to Dismiss, or for

Summary Judgment, in categories pertinent to the issues raised.

1.   The Defendant Ramsay's Motion to Dismiss.  The Plaintiff asserts

claims against Ramsay, who is the Duluth Chief of Police, in both his individual and

official capacities.   See, <u>Amended Complaint</u>, supra at 1.   Claims made against individuals in their official capacities are suits against their public employer -- here, the City of Duluth.[13]   See, <u>Johnson v. Outboard Marine Corp.</u>, 172 F.3d 531, 535 (8th Cir. 1999) ("A suit against a public employee in that person's official capacity is merely a suit against the public employer."), citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).   Accordingly, we first turn to address the Plaintiff's individual capacity claims against Ramsay.

In order to sustain a claim under Section 1983, a plaintiff must show that the named defendants were directly, and personally, involved in the illegal acts, or in the policy decision which created the unlawful context for those acts.   See, e.g., <u>Beck v. LaFleur</u>, 257 F.3d 764, 766 (8th Cir. 2001); <u>McNair v. Norris</u>, 2000 WL 490709 at *1 (8th Cir., April 27, 2000); <u>Martin v. Sergeant</u>, 780 F.2d 1334, 1337 (8th Cir. 1985). Accordingly, the doctrine of <u>respondeat</u> <u>superior</u> is not available to a Section 1983 plaintiff.   See, e.g., <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 691 (1978); <u>Lux by Lux v. Hansen</u>, 886 F.2d 1064, 1067 (8th Cir. 1989); <u>Rasmussen v. Larson</u>, 863 F.2d 603, 605 (8th Cir. 1988).

---

[13]Since we conclude that there has been no violation of the Plaintiff's constitutional rights, we also recommend dismissal of the Plaintiff's official capacity claims against Ramsay.

Therefore, absent a showing of direct and personal involvement, on the part of Ramsay, in the allegedly unlawful conduct, the only other basis, upon which the Plaintiff may state a claim against him, is by demonstrating that Ramsay failed to properly train, supervise, or control, the actions of a subordinate, who invaded the Plaintiff's rights. See, City of Canton v. Harris, 489 U.S. 378, 388 (1989); Ruge v. City of Bellevue, 892 F.2d 738, 739-40 (8th Cir. 1989); Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989).

Given the absence of any allegation that Ramsay was personally, or directly, involved in any constitutional wrong that the Plaintiff seeks to vindicate, and given the absence of any allegation which would demonstrate that Ramsay was involved in any policy decision, or that he failed to properly train or supervise the officers who were involved in the Plaintiff's arrests or traffic stops, we recommend that the Plaintiff's individual capacity claims against Ramsay be dismissed.

2.     The Duluth Defendants' Motion for Summary Judgment.

a.     Statute of Limitations.  As noted, the Plaintiff has raised a Fourth Amendment claim that is based upon his traffic stop on June 15, 1999, which resulted in a citation, and the towing of his vehicle.  See, Amended Complaint, supra

at 5.  The Duluth Defendants contend that the Plaintiff's claim is barred by the applicable statute of limitations.

Courts refer to the appropriate State statute of limitations when determining the limitations period in a Section 1983 action.  See, Wallace v. Kato, 549 U.S. 384, 387 (2007); Baker v. Chisom, 501 F.3d 920, 922 (8th Cir. 2007), cert. denied, --- U.S. ---, 128 S.Ct. 2932 (2008); Bell v. Flower, 99 F.3d 262, 266 (8th Cir. 1996).  In Owens v. Okure, 488 U.S. 235, 250 (1989), the Supreme Court held  "that where state law provides multiple statutes of limitations for personal injury actions, courts considering §1983 claims should borrow the general or residual statute for personal injury actions."  See also, Sanchez v. United States, 49 F.3d 1329, 1330 (8th Cir. 1995)("The limitations period for a section 1983 action is governed by the statute of limitations for personal injury actions in the state in which the claim accrues."), citing Wilson v. Garcia, 471 U.S. 261, 280 (1985).  "In Minnesota, §1983 claims are governed by the six-year limitations period of Minnesota's personal-injury statute, Minn.Stat. §541.05, Subdivision 1(5)."  Egerdahl v. Hibbing Community College, 72 F.3d 615, 618 n. 3 (8th Cir. 1995), citing Berg v. Groschen, 437 N.W.2d 75, 77 (Minn.App. 1989); Olson v. City of Sartell, 2005 WL 396295 at *1 (D. Minn., February 15, 2005)("The Magistrate Judge correctly noted that in Minnesota all §1983 claims must be filed

within six years of the date of the allegedly illegal act.")[citation omitted], aff'd, 138 Fed.Appx. 895, 2005 WL 1669567 (8th Cir., July 19, 2005); <u>Simington v. Minnesota Veterans Home</u>, 464 N.W.2d 529, 530 (Minn. App. 1990), rev. denied (Minn., March 15, 1991)("Minnesota's residual limitations period for personal injury actions is six years."), citing <u>Minnesota Statutes Section 541.05, Subdivision 1(5)</u> [citations omitted].

As noted, the Plaintiff's first traffic stop and arrest occurred on June 9, 1999, but he did not commence his present action until January 26, 2007, more than six (6) years later.  As a result his claim is time-barred, and we recommend that the claim be dismissed with prejudice.

b.      <u>The Heck Doctrine.</u>  Next, the Duluth Defendants contend that a majority of the Plaintiff's Fourth Amendment claims are barred by the <u>Heck</u> doctrine.  See, <u>Heck v. Humphrey</u>, supra.  In <u>Heck</u>, the United States Supreme Court held that, in order to recover damages for a purportedly unlawful conviction or confinement, under Section 1983, the plaintiff must prove, as an element of his claim, that the conviction at issue was reversed on direct appeal, or was otherwise declared invalid.  See, <u>Heck v. Humphrey</u>, supra at 486; see also, <u>Moore v. Sims</u>, 200 F.3d 1170, 1171 (8th Cir. 2000).  There, the Supreme Court found that the Plaintiff, who

asserted a Section 1983 claim based upon an assertedly unlawful State conviction, must allege, and prove, a "termination of the prior criminal proceeding in favor of the accused," id., at 486-87, by demonstrating "that the conviction or sentence has been reversed by direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 487.

The holding, in Heck, extends not only to damages claims "for an allegedly unconstitutional conviction or imprisonment," but also to claims "for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid." Id. As a consequence, "a claim for damages bearing that relationship to a conviction or sentence that has **not** been so invalidated is not cognizable under §1983." Id [emphasis in original]. Moreover, the burden lies on the Plaintiff to "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Wilson v. Lawrence County, Missouri, 154 F.3d 757, 760 (8th Cir. 1998), cert. denied, 525 U.S. 1069 (1999), quoting Heck v. Humphrey, supra at 486-87; see also, Williams v. Schario, 93 F.3d 527, 529 (8th Cir. 1996) .

As noted, the Plaintiff challenges a number of citations and arrests by the Duluth Defendants. However, since the Plaintiff has failed to satisfy his burden to demonstrate that his convictions meet any <u>Heck</u> exception, we find that all of his claims are barred by the <u>Heck</u> doctrine. For the sake of simplicity, we analyze the Plaintiff's claims in chronological order.

The Plaintiff first challenges citations, and a seizure of his vehicle, which arose out of traffic stops on January 5, and 7, 2003. On January 5, 2003, the Plaintiff received a citation from Wilson for crossing the white line. See, <u>Amended Complaint</u>, supra at 5. The Plaintiff's Minnesota driving record shows that he was convicted on that citation. See, <u>Lesar Aff.</u>, supra, Exhibit A. On January 7, 2003, Wilson conducted a traffic stop, and cited the Plaintiff for failing to comply with a police officer, and for possessing no proof of insurance, and the Plaintiff was taken into custody, which resulted in the towing of his vehicle. See, <u>Amended Complaint</u>, supra at 6; <u>Duluth Defendants' Memorandum in Support</u>, supra at 2; <u>Lutterman Aff.</u>, supra, Exhibit 1 at 1-3. On April 23, 2003, the Plaintiff pled guilty to both charges. See, <u>Lutterman Aff.</u>, supra, Exhibit 1 at 1; <u>Lesar Aff.</u>, supra, Exhibit A. The Plaintiff has not demonstrated that any of those convictions have been reversed, expunged, or declared invalid, as required by <u>Heck</u>. See, <u>Wilson v. Lawrence County, Missouri</u>,

supra at 760. Accordingly, with respect to the traffic stops of January 5, and 7, 2003, we conclude that the Plaintiff's claims are barred by Heck.[14]

The Plaintiff also challenges his arrest on September 21, 2006, following his ejection from the Casino, which resulted in misdemeanor charges for obstructing a police officer, and trespass on private property. See, Amended Complaint, supra at 7-8; Lutterman Aff., supra, Exhibit 2. Although the Plaintiff pled not guilty to the charges, on May 30, 2007, the Plaintiff was convicted on both Counts. Id. The Plaintiff has not offered any evidence that his conviction meets any of the Heck exceptions, and accordingly, we find that that claim is also barred.

Lastly, the Plaintiff challenges his arrest on April 26, 2007, at St. Mary's . See, Amended Complaint, supra at 11. As a result of that arrest, the Plaintiff was charged with two (2) misdemeanors, for Trespass, and for Obstructing the Legal Process. See,

---

[14]Furthermore, the Plaintiff asserts a claim based upon the towing of his vehicle after his arrest on January 7, 2003. We find that claim to be without merit, because police officers are allowed to tow vehicles for safekeeping when an individual is taken into custody. See, Minnesota Statutes Section 160.041, Subdivision 12 (a towing authority does not have to obey the four-hour waiting period before towing a motor vehicle if "the driver, operator, or person in physical control of the vehicle is taken into custody and the vehicle is impounded for safekeeping[.]"); United States v. Hood, 183 F.3d 744, 746 (8th Cir. 1999)(finding that "Minnesota statutes permit police to impound a vehicle for safekeeping when 'the driver * * * of the vehicle is taken into custody.'")[citation omitted], cert. denied, 531 U.S. 943 (2000).

<u>Lutterman Aff.</u>, supra, Exhibit 3.   The charges were later amended to ordinance violations.   <u>Id.</u>   Ultimately, the charge for Obstructing the Legal Process was dismissed but, on October 10, 2007, the Plaintiff was convicted of Trespass.[15] <u>Id.</u>  The Plaintiff has also failed to demonstrate that that conviction falls under any of the <u>Heck</u> exceptions, and accordingly, we conclude that his claim is barred.

Since the Plaintiff has failed to show that any of the referenced convictions fall under any exceptions, those claims are barred by <u>Heck v. Humphrey</u>, and we recommend that the Duluth Defendants' Motion be granted with respect to those claims.

---

[15]Although the charge for Obstructing the Legal Process was dismissed, we still find that the Plaintiff's claim is barred by <u>Heck</u> because the Plaintiff's claim, that his arrest was unlawful, would necessarily challenge his underlying conviction for Trespass and we conclude that his arrest was made with probable cause.  See, <u>Minnesota Statutes Section 629.34, Subdivision 1(1)</u>(a Peace Officer may make an arrest without a Warrant "when a public offense has been committed or attempted in the officer's presence"); <u>United States v. Rambo</u>, 789 F.2d 1289, 1294 n. 4 (8th Cir. 1986)("The term 'public offense' has been construed to embrace petty misdemeanors."), citing <u>Smith v. Hubbard</u>, 91 N.W.2d 756, 761 (1958) and <u>State v. Sellers</u>, 350 N.W.2d 460, 462 (Minn. App. 1984);  see also,  <u>Rule 6.01, Minnesota Rules of Criminal Procedure</u>, ("Law enforcement officers acting without a warrant * * * shall issue citations for * * * misdemeanors, unless it reasonably appears to the officer that arrest or detention is  necessary to prevent * * * further criminal conduct [.]"); <u>Perkel v. City of Springfield</u>, 10 Fed.Appx. 390, 391 (8th Cir. 2001)(concluding that the "arresting officers had probable cause to arrest him for trespassing based on the trespassing victim's report.").

c.     The Plaintiff's Arrest on September 20, 2006.  The Plaintiff

asserts that his Fourth Amendment rights were violated by his arrest on September 20,

2006, at a Little Store gas station.[16]  See, Amended Complaint, supra at 3-4.  The

Duluth Defendants contend that the Plaintiff's arrest was supported by probable cause.

See, Duluth Defendants' Memorandum in Support, supra at 21.

1).     Standard of Review.  When a police officer has

probable cause to believe that a person has committed a felony, a warrantless arrest

is permitted.  See, United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993), citing

United States v. Watson, 423 U.S. 411 (1976).  "Determining probable cause to arrest

requires the court to focus on the moment the arrest was made and to ask whether 'the

facts and circumstances within [the officers'] knowledge and of which they had

reasonably trustworthy information were sufficient to warrant a prudent man in

believing that the [suspect] had committed or was committing an offense.'"  United

States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89,

91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000) ("Furthermore,

'[a]n officer has probable cause to make a warrantless arrest when facts known to the

_____

[16]The Plaintiff incorrectly cites the arrest date as September 21, 2006.  See,
Amended Complaint, supra at 3.

officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting Olinger v. Larson, 134 F.3d 1362, 1366 (8th Cir. 1998); Tokar v. Bowersox, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense.").

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'" Tokar v. Bowersox, supra at 1047, quoting United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983). We recognize, and accept, that an officer engaged in an arrest need not personally have found probable cause in order to lawfully effect the arrest. As the Court explained, in United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001), cert. denied, 534 U.S. 982 (2001):

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory, United States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000), to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure. Under this

rationale, the validity of a search "may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if * * * some degree of communication exists between them," id.  See also United States v. Morales, 238 F.3d 952, 953 (8th Cir. 2001), and United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997). The requirement that there be a degree of communication serves to distinguish between officers functioning as a "search team," United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989), and officers acting as independent actors who merely happen to be investigating the same subject.

We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."  Id.

2)     Legal Analysis.  Here, it is undisputed that the Plaintiff's arrest was warrantless but, viewing the Record from the stance of a reasonably prudent police officer, we conclude that Tomlin had probable cause to arrest the Plaintiff on September 20, 2006.

On September 20, 2006, at approximately 2:19 o'clock a.m., Duluth police officers responded to a private citizen's complaint that a grey Ford pickup had left a nearby bar and nearly struck his vehicle.  See, Tomlin Aff., supra, Exhibit A at 1. Tomlin traveled to the Little Store, found a vehicle matching the witness's description,

- 33 -

and requested the Plaintiff's drivers license, which the Plaintiff could not locate.  Id.,

Exhibit A at 1-2.  After Tomlin detected the odor of alcohol on the Plaintiff's breath,

the Plaintiff admitted that he had been drinking, and he agreed to take a PBT.  Id.,

Exhibit A at 2.   However, the Plaintiff failed to perform the PBT correctly.  Id.

Tomlin warned the Plaintiff that, if he did not complete the PBT properly, he would

be arrested for driving while intoxicated.  Id.  After the Plaintiff refused to perform

the PBT properly, Tomlin placed the Plaintiff under arrest.  Id.

Based upon the factual circumstances, we find that Tomlin had probable cause

to arrest the Plaintiff.  Although the Plaintiff is not challenging Tomlin's right to

request a PBT, we find, as a preliminary matter, that Tomlin had a specific and

articulable suspicion to request a PBT.  "An officer may request a PBT when the

officer has reason to believe this person was driving under the influence," and "[that]

belief must be based on 'specific and articulable facts'[.]"  O'Fallon v. Comm'r of

Public Safety, 2008 WL 3835728 at * 2 (Minn.App., August 19, 2008)[citations

omitted]; see also, Minnesota Statutes Section 169A.41, Subdivision 1 ("When a

peace officer has reason to believe from the manner in which a person is driving * *

* that the driver may be violating or has violated [Minnesota Statues] section

169A.20, * * * the officer may require the driver to provide a sample of the driver's

breath for a preliminary screening test[.]"); <u>Colville v. Comm's of Public Safety</u>, 2008 WL 422461 at * 2 (Minn.App., September 16, 2008)(An "officer may request a PBT if he can point to specific, articulable facts that form his belief[,]" that an individual was driving while intoxicated.).  "Articulable suspicion includes the observation of sufficient indicia of intoxication."  <u>State v. Carlson</u>, 2005 WL 1742764 at *3 (Minn. App., July 26, 2005)  citing <u>State v. Driscoll</u>, 427 N.W.2d 263, 265-66 (Minn. App. 1988).

Here, Tomlin had a specific and articulable suspicion that the Plaintiff had been driving while intoxicated, based on the smell of alcohol on the Plaintiff's breath, the Plaintiff's erratic behavior, and the Plaintiff's admission that he had consumed alcohol earlier that night.  See, <u>Minnesota Statutes Sections 169A.40, Subdivision 1 and 169A.41, Subdivision 1</u>; <u>Colville v. Comm'r of Public Safety</u>, supra at *2 (determining that the police officer had specific and articulable suspicion to request a PBT when the officer observed blood shot eyes, slurred speech, and the faint order of alcohol); <u>O'Fallon v. Comm'r of Public Safety</u>, supra at *2 (finding that the police officer had a specific and articulable suspicion to request a PBT when the officer observed the driver's driving conduct, blood shot eyes, and odor of alcohol and the

driver's difficulty producing his license and proof insurance).  Accordingly, Tomlin's

request for a PBT was proper.

Next, we conclude that Tomlin had probable cause to arrest the Plaintiff for

driving while impaired.  As a threshold matter, we find that the Plaintiff's failure to

perform the PBT properly was a refusal to take the PBT, which is a crime under

Minnesota law.  See, Minnesota Statutes Section 169A.20 Subdivision 2 ("It is a

crime for any person to refuse to submit to a chemical test of the person's * * *

breath[.]"); Cole v. Comm'r of Public Safety, 535 N.W.2d 816, 818 (Minn.App.

1995)(concluding that the driver had constructively refused to submit to a breath test

where he had three (3) opportunities to provide an adequate second sample); Anderson

v. Comm'r of Public Safety, 441 N.W.2d 126, 128 (Minn.App. 1989) (finding that the

driver's "failure to provide two adequate breath samples constituted a refusal to

submit to testing[.]"); Donnelly v. Comm'r of Public Safety, 422 N.W.2d 528, 529

(Minn.App. 1988)(stating that, when a driver's  "first breath test was not completed

because his second breath sample was invalid, failure to take another breath test was

a refusal to submit to testing[.]").  The Plaintiff's failure to perform the PBT, as

coupled with the private citizen's complaint, the Plaintiff's widely ranging behavior,

the alcoholic odor on his breath, and the Plaintiff's admission that he had been

drinking that night, provided Tomlin probable cause to arrest the Plaintiff for driving while impaired.   See, <u>Minnesota Statutes Section 169A.40,Subdivision 1</u> ("A peace officer may lawfully arrest a person for [driving while impaired] * * * without a warrant upon probable cause, without regard to whether the violation was committed within the officer's presence."); <u>State v. Laducer</u>, 676 N.W.2d 693, 698 (Minn.App. 2004)(finding that "[a]n admission of drinking, coupled with indicators of intoxication, is sufficient probable cause for arrest," regardless of the PBT result), citing <u>State v. Grohoski</u>, 390 N.W.2d 348, 351 (Minn.App. 1986)(finding that police officer's observation that the driver had bloodshot watery eyes, alcohol on his breath, and admission that he had been drinking, were sufficient to justify the officer's belief that the driver was under the influence); <u>Holm v. Comm'r of Public Safety</u>, 416 N.W.2d 473, 475 (Minn.App. 1987)(concluding that the officer's recognition that the defendant had bloodshot watery eyes, and alcohol on his breath, were sufficient to form probable cause to believe that the defendant was driving while intoxicated); <u>Johnson v. Comm'r of Public Safety</u>, 394 N.W.2d 614, 616 (Minn.App. 1986)(finding that a police officer can rely on a private citizen's information to form probable cause that the driver was driving while intoxicated); <u>State v. Vievering</u>, 383 N.W.2d 729, 730 (Minn.App. 1986)(stating that the officer had probable cause to believe that the

defendant was driving under the influence when the officer detected "strong odor of alcohol on both [defendant] and her passenger, and discovered two open cans of beer on the floor of the vehicle.").

After the Plaintiff's arrest, he was taken to a Duluth Police Station, where he again agreed to provide a breath sample.  The samples registered a .06 blood alcohol content rating, which is below the legal limit.  However, the Plaintiff's precise blood alcohol content does not change our conclusion that Tomlin had probable cause to arrest the Plaintiff for driving under the influence.  In Minnesota, an individual's blood alcohol content need not be over the legal limit before being cited for driving while impaired.  An officer may cite a person for driving, while impaired, if the officer considers the person to be under the influence of alcohol.  See, Minnesota Statutes Section 169A.20, Subdivision 1.; State v. Bestick, 1997 WL 360579 at*2 (Minn.App., July 1, 1997)("There is no defined level of alcohol concentration at which a driver is presumed to be under the influence of a controlled substance."), citing State v. Hegstrom, 543 N.W.2d 698, 702 (Minn. App. 1996), rev. denied, 1998 WL 100601 (Minn., March 10, 1998); see also, Reeves v. Comm'r of Public Safety, 751 N.W.2d 117, 120 (Minn.App. 2008)(finding that, despite the driver's alcohol concentration being under the legal limit, law enforcement had probable cause for arrest, because the

totality of the circumstances indicated that the driver had been driving while intoxicated).  Notably, here, after obtaining the PBT results, the Plaintiff was released, and provided transportation to his residence.

Accordingly, we find that the Plaintiff's arrest on September 20, 2006, was supported by probable cause, and we recommend that the Duluth Defendants' Motion for Summary Judgment be granted in that respect.

> d.    <u>Qualified Immunity.</u>  The Duluth Defendants contend that Tinsley, Helgemoe, and any unnamed officers, who were involved in the Plaintiff's arrests and custodial detention on April 26, 2007, are entitled to qualified immunity. We agree.

> 1)    <u>Standard of Review.</u>  Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See, <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>Young v. Harrison</u>, 284 F.3d 863, 866 (8th Cir. 2002); <u>Winters v. Adams</u>, 254 F.3d 758, 766 (8th Cir. 2001). "To withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the

time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right." Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999);  see also, Young v. Harrison, supra at 866-67.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." Wilson v. Layne, supra at 614.  The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 641 (1987).  As a consequence, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996).

When qualified immunity is asserted in a Section 1983 action, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional

right at all * * *." Jones v. Shields, 207 F.3d 491, 494 (8th Cir. 2000), quoting Wilson

v. Layne, supra at 609 [citations omitted].  "Only then do we ask whether that right

was clearly established at the time of the alleged violation."  Id.;  see, Coonts v. Potts,

316 F.3d 745, 750 (8th Cir. 2003), citing Siegert v. Gilley, 500 U.S. 226, 232 (1991).

2)      Legal Analysis.

a)      The Plaintiff's Arrest on September 21, 2006.

The Plaintiff alleges that his Fourth Amendment rights were violated when he was

arrested by Tinsley, and Helgemoe, on September 21, 2006, outside of the Casino.

See, Amended Complaint, supra at 9.  The Plaintiff also contends that his Fourth and

Eighth Amendment rights were violated by Helgemoe, and Tinsley, when they

allegedly directed hospital staff to perform a blood draw without the Plaintiff's

consent, and when they subjected him to verbal and physical harassment at St.

Luke's.[17]  Id.  Although we have already determined that the Plaintiff's alleged Fourth

Amendment violations, which related to his Casino arrest, are barred by the Heck

doctrine, for the sake of completeness, we analyze the Plaintiff's claim.

---

[17]Lastly, the Plaintiff contends that Helgemoe, and Tinsley, were negligent in
failing to ensure that he received proper medical care.  See, Amended Complaint,
supra at 8.  We address that claim later in this Report.

"'Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe that the suspect has committed a crime.'" United States v. Cardenas-Celestino, 510 F.3d 830, 833 (8th Cir. 2008), quoting United States v. Sherrill, 27 F.3d 344, 347 (8th Cir. 1994), cert. denied, 513 U.S. 1048 (1994).   As we have already noted,  "'[t]he determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'" Tokar v. Bowersox, supra at 1047.

Here, the totality of circumstances provided Helgemoe with probable cause to arrest the Plaintiff.  On September 20, 2006, Helgemoe and Tinsley responded to an emergency call, which came from the Casino's security staff, and which related to the Plaintiff's ejection from the Casino.  See, Helgemoe Aff., supra, Exhibit A at 1.  As Helgemoe arrived upon the scene, he saw that the Plaintiff, who was pinned to the ground, was yelling and was combative.  Id.  After the Plaintiff was put in handcuffs, and placed in Helgemoe's squad car, the Casino security guards explained that the Plaintiff had been barred from the Casino, and that, when he was forced to leave, he resisted.  Id.

Based upon the statements from the Casino security guards, the emergency call, and his own personal observations, Helgemoe had probable cause to conclude that the Plaintiff was unlawfully trespassing on the Casino's property.  See, <u>Minnesota Statutes Section 609.605, Subdivision 1(b)(3)</u> (stating that a person "trespasses on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor); <u>Subdivision 1(b)(7)</u>(an individual trespasses when he "returns to the property of another with the intent to abuse, disturb, or cause distress in or threaten another, after being told to leave the property and not to return, if the actor is without claim of right to the property or consent of one with authority to consent[.]"); <u>Subdivision 1(b)(8)</u>(a person trespasses if he "returns to the property of another within one year after being told to leave the property and not to return, if the actor is without claim of right to the property or consent of one with authority to consent[.]").  Under Minnesota law, Helgemoe was authorized to arrest the Plaintiff.  See, <u>Minnesota Statutes Section 629.34, Subdivision 1(1)</u>; <u>United States v. Rambo</u>, supra at 1294 n.4; see also, <u>Rule 6.01, Minnesota Rules of Criminal Procedure</u>.; <u>Perkel v. City of Springfield</u>, supra at 391.  Accordingly, Helgemoe's arrest of the Plaintiff was lawful.

The Plaintiff next asserts that his Fourth Amendment rights were violated when Helgemoe, and Tinsley, allegedly directed the St. Luke's staff to perform a blood draw, in order to check for controlled substances.  See, Amended Complaint, supra at  9.  "A seizure for Fourth Amendment purposes occurs when a government actor 'by means of physical force or show of authority * * * in some way restrain[s] the liberty of a citizen.'"  McVay ex rel. Estate of McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908 (8th Cir. 2005), citing Graham v. Connor, 490 U.S. 386, 395 n.10. (1989).  Individuals have a reasonable expectation of privacy in the personal information that their body fluids contain.  See, Glover v. Eastern Nebraska Community Officer of Retardation, 686 F.Supp. 243, 250 (D.Neb. 1988), aff'd, 867 F.2d 461 (8th Cir. 1989).  Compulsory administration of a blood test "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." Schmerber v. California, 384 U.S. 757, 767 (1966).  As such, mandatory blood testing must  comply  with  the  standards  of  reasonableness  imposed  by  the  Fourth Amendment.  Id.

Both Helgemoe, and Tinsley, explicitly deny, under oath, directing the St. Luke's staff to perform a blood draw on the Plaintiff.  See, Helgemoe Aff., supra at ¶3; Tinsley Aff., supra at ¶3.  In addition, the Record does not include any evidence

that any blood test was requested, or performed.  See, <u>Helgemoe Aff.</u>, supra, Exhibit A.  The Plaintiff has failed to offer any evidence which would refute the Duluth Defendants' attestations, and accordingly, his Fourth Amendment claim necessarily fails.  See, <u>Cross v. United Auto Workers, Local 1762</u>, 450 F.3d 844, 847-48 (8th Cir. 2006)("[The plaintiff] simply failed to meet his burden of producing evidence in response to the motion [for] summary judgment," as he "'may not rest upon the mere allegations or denials of his pleading, but * * * must set forth specific facts showing that there is a genuine issue for trial.'"), quoting <u>Rule 56(c), Federal Rules of Civil Procedure</u>.

The Plaintiff also contends that Tinsley verbally and physically harassed him at St. Luke's.  See, <u>Amended Complaint</u>, supra at 9.  Both Helgemoe, and Tinsley, deny any verbal or physical harassment, but admit that, at one point, the Plaintiff had to be restrained to his hospital bed.  See, <u>Helgemoe Aff.</u>, supra at ¶4, Exhibit A at 1; <u>Tinsley Aff.</u>, supra at ¶5.  Construing the Amended Complaint generously, we understand the Plaintiff to argue that Helgemoe, and Tinsley, used excessive force when they restrained him to his hospital bed.

As a threshold matter, it is unclear whether the Plaintiff was an arrestee, or a pretrial detainee, while at St. Luke's. "Between arrest and sentencing lies something

of a legal twilight zone." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000); Ogden

v. Johnson, 2002 WL 32172301 at *2 (N.D. Iowa, September 5, 2002).  The Supreme

Court has left open the question of "'when arrest ends and pretrial detention begins.'"

See, Wilson v. Spain, supra at 715, quoting Graham v. Connor, 490 U.S. 386, 395 n.

10 (1989).  Although the line has not been clearly drawn between an arrestee, and a

pretrial detainee for excessive force claims, similar cases, from this Circuit, have

placed the Plaintiff's claim within the Fourth Amendment's purview.  See, Wilson v.

Spain, supra at 715-16 (affirming the use of Fourth Amendment analysis to an

excessive force claim that allegedly took place after the plaintiff was booked, and

placed in a holding cell); Moore v. Novak, 146 F.3d 531, 535 (8th Cir. 1998)

(approving application of Fourth Amendment analysis when the alleged excessive

force occurred during the booking process); Mayard v. Hopwood, 105 F.3d 1226,

1228 (8th Cir. 1997)(affirming the use of Fourth Amendment analysis to the alleged

use of excessive force that occurred after the plaintiff had been arrested, and was

being transported to police headquarters).[18]

---

[18]Furthermore, even if we were to characterize the Plaintiff as a pretrial detainee, his claim would fail for, as explained by our Court of Appeals, "if [the plaintiff] cannot win his case under Fourth Amendment standards, it is a certainty he cannot win it under the seemingly more burdensome, and clearly no less burdensome, standards

(continued...)

Under the Fourth Amendment, the question is "whether the amount of force used was objectively reasonable under the particular circumstances." Winters v. Adams, supra at 766 (8th Cir. 2001), quoting Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). The factors, which must be considered in the excessiveness analysis, include "the severity of the suspected crime, whether the suspect posed an immediate threat to the officer or others, and whether the suspect was actively resisting arrest." Goff v. Bise, 173 F.3d 1068, 1073 (8th Cir. 1999), citing Nelson v. County of Wright, 162 F.3d 986, 990 (8th Cir. 1998), citing, in turn, Graham v. Connor, supra at 394. Of course, "this generalized right to be free from an unreasonable use of excessive force during a police seizure does not clearly establish a right for purposes of a qualified immunity analysis." Mettler v. Whitledge, 165 F.3d 1197, 1202-03 (8th Cir. 1999), citing Anderson v. Creighton, 483 U.S. 635, 639 (1987). Rather, a plaintiff "must show the right was clearly established in a particularized sense relevant to the case at hand." Id. at 1203.

---

[18](...continued)
that must be met to establish a Fourteenth Amendment substantive due process claim." Wilson v. Spain, supra at 716, citing County of Sacramento v. Lewis, 523 U.S. 833, 845-55 (1998) and Latta v. Keryte, 118 F.3d 693, 701-02 (10th Cir. 1997).

Here, we conclude that the use of force, by Helgemoe and Tinsley, was objectively reasonable. Helgemoe and Tinsley describe the Plaintiff as saying strange things and being combative, and they believed that it was necessary to restrain the Plaintiff for the safety of himself, and others. See, Helgemoe Aff., supra, Exhibit A; Tinsley Aff., supra at ¶5. Both Helgemoe, and Tinsley, deny using any other force or harassment, and the Plaintiff has not competently refuted those allegations. See, Helgemoe Aff., supra at ¶4; Tinsley Aff., supra at ¶5. As a result, we conclude that the force used was objectively reasonable, under the operative circumstances. See, Lacy v. City of Bolivar, Missouri, 416 F.3d 723, 728 (8th Cir. 2005)(finding that officers did not use excessive force in restraining the plaintiff in the hospital where the plaintiff was a threat to himself and others); Threlkeld v. White Castle Systems, Inc., 201 F. Supp.2d 834, 840 (N.D. Ill. 2002)(granting Summary Judgment to police officers as to the plaintiff's excessive force claim for restraining her to a hospital bed).

Moreover, the Plaintiff has not alleged, let alone proven, that he suffered an actual injury as a result of Helgemoe and Tinsley's use of force. See, Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005)(excessive force claim cannot be sustained where the claimant shows no more than "very minor injuries, likely nothing more than

- 48 -

the temporary and slight aggravation of pre-existing conditions"); Hanig v. Lee, 415

F.3d 822, 824 (8th Cir. 2005)("An 'actual injury' must be shown to support an

excessive force claim under the Fourth Amendment."), citing Dawkins v. Graham, 50

F.3d 532, 535 (8th Cir. 1995); Brown v. City of Golden Valley, 534 F. Supp.2d 984,

993-994 (D. Minn. 2008)("Mere allegations of pain as a result of being handcuffed,

including bleeding, without any allegation of long-term injuries, are not sufficient

injuries to support a claim for excessive force."), citing Crumley v. City of St. Paul,

324 F.3d 1003, 1008 (8th Cir. 2003); cf., Wertish v. Krueger, 433 F.3d 1062, 1067 (8th

Cir. 2006)(finding that "relatively minor scrapes and bruises and the less-than-

permanent aggravation of a prior shoulder condition were de minimis injuries that

support a conclusion that [the defendant] did not use excessive force" during the

course of the plaintiff's arrest).   Therefore, we recommend that Summary Judgment

be granted with respect to the Plaintiff's claims against Helgemoe and Tinsley.

        c)      The Plaintiff's Arrest and Detention on April 26, 2007.

        The Plaintiff also alleges an excessive force

claim, which is based upon his arrest on April 26, 2007, at St. Mary's.  See, Amended

Complaint, supra at 10.  Again, we analyze the Plaintiff's claim under the Fourth

Amendment.

The Plaintiff alleges that "Duluth Police did not have to slam the Plaintiff * *

* up against the Hospital wall outside the chapel" during the search of his person.

See, Amended Complaint, supra at 11.  As to this claim, Drozdowski attests that the

Plaintiff refused to turn around, so as to allow Hanson to pick up some loose change

without fear of being assaulted by the Plaintiff.  See, Drozdowski Aff., supra, Exhibit

A at 2.  After the Plaintiff refused to turn around, Drozdowski took control of the

Plaintiff's upper body, and restrained him against a wall.  Id.  The Plaintiff continued

to struggle, and Drozdowski then restrained the Plaintiff's head against the wall.  Id.

The Plaintiff also had to be restrained against a squad car, before he was placed in the

back of the squad car.  Id.

Once again, under the specific facts here, we conclude that the Plaintiff's claim

fails, because he has not alleged, nor proven, that he suffered any actual injury -- not

even a de minimis injury -- as a result of the use of force by Hanson and Drozdowski.

See, Andrews v. Fuoss, supra at 818; Hanig v. Lee, supra at 824; Brown v. City of

Golden Valley, supra at 993-94; see also, Wertish v. Krueger, supra at 1067; Curd v.

City of Judsonia, Arkansas, 141 F.3d 839, 841 (8th Cir. 1998)(finding that its

conclusion, that the police officer grabbing of the arrestee's arm, and turning the arrestee's body, was not excessive force, was bolstered by the arrestee's failure to allege or demonstrate an actual injury), cert. denied, 525 U.S. 888 (1998), citing Dawkins v. Graham, supra at 535; Michaud v. Demarest, 2008 WL 4057744 at *6 (D. Minn., August 26, 2008)("To support a claim of excessive force under the Fourth Amendment, the plaintiff must come forward with evidence of an actual injury.") [citations omitted]; Hasher v. City of Rochester, 2005 WL 1925856 at *4 (D. Minn., August 11, 2005)("[I]n absence of more than minimal injury, [p]laintiff's claim that [d]efendants utilized excessive force during his arrest fails."). As a result, we recommend that the Duluth Defendants' Motion for Summary Judgment be granted, in this respect.

The Plaintiff has also alleged that his constitutional rights were violated during his booking process at the St. Louis County Jail, when Hanson allegedly instructed another officer not to release the Plaintiff until after 6:00 o'clock p.m. See, Amended Complaint, supra at 11. The Plaintiff alleges that, as a result, he missed Jury Duty and a Court appearance, which resulted in the issuance of a Warrant for his arrest. Id. Here, the Plaintiff does not challenge the validity of his arrest, nor do we find any basis upon which to conclude that his arrest was unlawful. See, Minnesota Statutes

Sections 609.50, Subdivisions 1(b)(3), 1(b)(7), 1(b)(8) (trespass); 609.50, Subdivision (1)(2), (an individual obstructs the legal process when he ""obstructs, resists, or interferes with a peace officer while the officer is engaged in the performance of official duties;[.]"); Minnesota Statutes Section 629.34, Subdivision 1(1); United States v. Rambo, supra at 1294 n. 4; see also, Rule 6.01, Minnesota Rules of Criminal Procedure; Perkel v. City of Springfield, supra at 391.   However, construing the Plaintiff's Amended Complaint indulgently, we understand his claim to be that his Fourteenth Amendment Due Process rights were violated by his allegedly extended period of detention.

Undoubtedly, the Constitution embodies a concept of substantive due process, which prevents Government actors from engaging in conduct that shocks the conscience, or that interferes with rights which are implicit in the concept of ordered liberty.  See, United States v. Salerno, 481 U.S. 739, 746 (1987); Moran v. Clarke, 296 F.3d 638, 643 (8th Cir. 2002); Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998); Brown v. Nix, 33 F.3d 951, 953 (8th Cir. 1994).  Substantive due process claims are, therefore, analyzed under two tests.  First, the Government is forbidden from infringing upon certain "fundamental" liberty interests to any degree -- no matter what process is provided -- unless the infringement is narrowly tailored to serve a

- 52 -

compelling governmental interest.  See, <u>Weiler v. Purkett</u>, supra at 1051, citing <u>Reno v. Flores</u>, 507 U.S. 292, 301-02 (1993).  Second, the Government's conduct somehow "must shock the conscience or otherwise offend our judicial notions of fairness, or must be offensive to human dignity."  <u>Id.</u>, citing <u>Weimer v. Amen</u>, 870 F.2d 1400, 1405 (8th Cir. 1989).

Here, on April 26, 2007, the Plaintiff was brought to the St. Louis County Jail, after being arrested for trespassing upon St. Mary's property, and for obstructing the legal process.  See, <u>Amended Complaint</u>, supra at 11; <u>Drozdowski Aff.</u>, supra, Exhibit A at 2.  Although it is not clear when, exactly, the Plaintiff was booked into the St. Louis County Jail, the Plaintiff states that he was released at 5:48 o'clock p.m on the same day as his arrest.  See, <u>Amended Complaint</u>, supr at 11.  Such a brief period of detention does not shock the conscience.  See, <u>Oertwig v. Hennepin County</u>, 162 Fed.Appx. 683, 683-84 (8th Cir. 2006)(sixteen (16) hours of detention not a constitutional violation); <u>Murphy v. County of Hennepin</u>, 162 Fed.Appx. 677 (8th Cir. 2006)(fourteen (14) hour period of detention not constitutionally violative); <u>Heryla v. Hennepin County</u>, 162 Fed.Appx. 676, 676-77 (8th Cir. 2006)(twenty-one-and-a-half (21½) hours of detention not unconstitutional); <u>Lund v. Hennepin County</u>, 427 F.3d 1123, 1124 (8th Cir. 2005)(twelve (12) hour delay in releasing arrestee, after

Judge ordered his release, no constitutional violation); <u>Killingham v. County of Hennepin</u>, 152 Fed.Appx. 554, 556 (8th Cir. 2005)(finding that the arrestee's eighteen (18) hour detention did not violate his constitutional rights); <u>Russell v. Hennepin County</u>, 420 F.3d 841, 850 (8th Cir. 2005)(arrestee's six (6) days of detention, after a Judge ordered his release, no constitutional violation); <u>Golberg v. Hennepin County</u>, 417 F.3d 808, 810 (8th Cir. 2005)(thirty-two (32) hours of detention, including ten (10) hours after the posting of bail, not a violation of constitutional rights); <u>Luckes v. County of Hennepin, Minn.</u>, 415 F.3d 936, 939-40 (8th Cir. 2005) (finding that twenty four (24) hour detention after arrest did not shock the conscience); <u>Jacobson v. Mott</u>, 2009 WL 113379 at *10 (D. Minn., January 16, 2009)(finding that the plaintiff's "detention from late Saturday night until Monday does not shock the conscience sufficiently to establish a violation of the Due Process Clause."); cf., <u>Hayes v. Faulkner County, Ark.</u>, 388 F.3d 669, 675 (8th Cir. 2004) (finding that the plaintiff's thirty eight (38) day detention before his initial appearance shocked the conscience).

Here, the Plaintiff was detained for at most a few hours, and was released on the same day of his arrest. Such a brief period of detention is not sufficient to support

a Due Process claim, and therefore, we recommend that the Duluth Defendants'
Motion for Summary Judgment be granted in this respect.

3.     The Plaintiff's Claims Against the City of Duluth.

"Municipalities are 'liable under Section 1983 only if a municipal
custom or policy caused the deprivation of the right protected by the constitution or
federal laws,' Angarita v. St. Louis County, 981 F.2d 1537, 1546 (8th Cir. 1992)
(citing Monell v. Dep't of Soc. Servs., supra at 690-91), or the 'municipal policy or
custom was the moving force [behind] the constitutional violation.'" Avalos v. City
of Glenwood, 382 F.3d 792, 802 (8th Cir. 2004), quoting Mettler v. Whitledge, 165
F.3d 1197, 1204 (8th Cir. 1999), quoting, in turn, Monell v. Dep't of Soc. Servs., supra
at 694.   "Before a municipality can be held liable * * * there must be an
unconstitutional act by a municipal employee." Reasonover v. St. Louis County, Mo.,
447 F.3d 569, 583 (8th Cir. 2006), quoting Russell v. Hennepin County, 420 F.3d 841,
846 (8th Cir. 2005); see also, Avalos v. City of Glenwood, supra at 802 ("For there to
be section 1983 liability, 'there must first be a violation of the plaintiff's constitutional
rights[,]' Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 777 (8th Cir. 2001)," and
"[u]nder this standard, there must be an unconstitutional act by the municipal
employee before the municipality is liable.").

- 55 -

Here, we have found no constitutional violations, by any of the Duluth Defendants, and therefore, the Plaintiff's Section 1983 claims against the City of Duluth fail for want of an unconstitutional act. As a result, we recommend that the Motion of the Duluth Defendants for Summary Judgment be granted, as to all of the Plaintiff's claims.

    4.    The Casino Defendants' Motion to Dismiss.

    a.    Subject Matter Jurisdiction.   As a Federal Court, we have limited jurisdiction, and may only hear matters which properly fall within our jurisdictional limits. See, Marine Equipment Management Co. v. United States, 4 F.3d 643, 646 (8th Cir. 1993)("Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."), citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986), citing, in turn, Marbury v. Madison, 5 U.S. [1 Cranch] 137 (1803). As a consequence, we have a primordial duty, in every case before us, to inquire whether the vital prerequisite of subject matter jurisdiction has been satisfied. See, Magee v. Exxon Corp., 135 F.3d 599, 601 (8th Cir. 1998); Bradley v. American Postal Workers Union, AFL-CIO, 962 F.2d 800, 802 n. 3 (8th Cir. 1992).

In his Amended Complaint, the Plaintiff asserts causes of action against the Casino Defendants, which arise under Title 42 U.S.C. §1983, for violations of his rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments.  See, <u>Amended Complaint</u>, supra at 1- 3, 8-9, 14.  However, the Casino Defendants are employed by the Casino, which is an arm of the Band, which, in turn, is a federally recognized Indian tribe, that predates the United States.  As "[a] separate sovereign[] pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority."  <u>Santa Clara Pueblo v. Martinez,</u> 436 U.S. 49, 56 (1978).  As succinctly summarized by the United States Court of Appeals for the Ninth Circuit:

> [N]o action under 42 U.S.C. §1983 can be maintained in federal court for persons alleging deprivation of constitutional rights under color of tribal law.  Indian tribes are separate and distinct sovereignties, Santa Clara Pueblo v. Martinez,  436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978); see, United States v. Wheeler, 435 U.S. 313, 331, 98 S.Ct. 1079, 1090, 55 L.Ed.2d 303 (1978), and are not constrained by the provisions of the fourteenth amendment.  Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529, 533 (8th Cir. 1967); see, Talton v. Mayes, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896); Martinez v. Southern Ute Tribe, 249 F.2d 915, 919 (10th Cir. 1957), cert. denied, 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958). As the purpose of 42 U.S.C. §1983 is to enforce the provisions of the fourteenth

> amendment, Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct.
> 473, 475, 5 L.Ed.2d 492 (1961); Thompson v. New York,
> 487 F. Supp. 212, 220 (N.D.N.Y.1979), it follows that
> actions taken under color of tribal law are beyond the reach
> of §1983, and may only be examined in federal court under
> the provisions of the Indian Civil Rights Act.

R.J. Williams Co. v. Fort Belknap Housing Authority, 719 F.2d 979, 982 (9th Cir. 1983); see also, Burrell v. Armijo, 456 F.3d 1159, 1174 (10th Cir. 2006)("A §1983 action is unavailable 'for persons alleging deprivation of constitutional rights under color of tribal law.'"), quoting Id.; Charland v. Little Six, Inc., 112 F. Supp.2d 858, 866 (D. Minn. 2000), aff'd, 13 Fed.Appx. 451 (8th Cir. 2001); Toineeta v. Andrus, 503 F. Supp. 605, 608 (D.C.N.C. 1980)("[The] Eastern Band of Cherokee Indians is not a municipal corporation or any other agency of the State of North Carolina and that as a matter of law the Indian Defendants are not state employees nor were they acting under color of state law at the times alleged in the complaint," and it "therefore follows that the complaint does not state a cause of action under 42 U.S.C. §1983 upon which this Court can grant relief."); Kaul v. Battese, 2004 WL 1732309 (D. Kan., July 27, 2004)(finding lack of subject matter jurisdiction over plaintiff's Section 1983 claims, as "'Indian tribes are not states of the union within the meaning of the Constitution, and the constitutional limitations on the states do not apply to tribes.'"), quoting Chapoose v. Hodel, 831 F.2d 931, 934 (10th Cir. 1987).

Here, the Casino Defendants contend that the Plaintiff's claims are not cognizable in a Section 1983 action, because they were acting under the color of Tribal law when they removed the Plaintiff from the Casino.  We agree.

"'The traditional definition of acting under color of state law requires that the defendant in a §1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Dossett v. First State Bank, 399 F.3d 940, 949 (8th Cir. 2005), quoting West v. Atkins,

487 U.S. 42, 49 (1988), quoting, in turn, <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941); see also, <u>Creason v. City of Washington</u>, 435 F. 3d 820, 823 (8th Cir. 2006)("To survive dismissal of their section 1983 cause of action, [the plaintiff] must have sufficiently alleged the [defendant] deprived them of a right 'secured by the Constitution and laws' of the United States, and the deprivation was caused by a person or persons acting under color of state law."), citing <u>Title 42 U.S.C. §1983</u> and <u>Flagg Bros., Inc. v. Brooks</u>, 436 U.S. 149, 155 (1978).

However, as we have detailed, "[i]t is well settled that a defendant's actions pursuant to Tribal authority are not 'under color of state law' for the purposes of maintaining an individual capacity suit against that defendant under 42 U.S.C. §1983." <u>E.F.W. v. St. Stephen's Mission Indian High School</u>, 51 F.Supp.2d 1217, 1230 (D.Wyo. 1999)[citations omitted], aff'd, 264 F.3d 1297 (10th Cir. 2001).  Here, the Band exercised its inherent authority to ban the Plaintiff from the Casino.  See, <u>Casino Defendants' Memorandum in Support</u>, supra, Exhibit A.   As recognized by the Supreme Court, in <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130, 144 (1982):

> Nonmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them. This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct * * *.  When a tribe grants a non-Indian the right to be on

Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry.

In order to enforce its right to exclude non-tribal members from the Casino, the Band promulgated certain procedures for the detention of, ejection of, and use of force on, individuals within the Casino.[19]  See, Casino Defendants' Memorandum in Support, supra, Exhibit D.

Specifically, when an individual is to be ejected from the Casino, he is first asked to leave but, if that individual refuses to leave, he is notified that law enforcement will be contacted.  Id., Exhibit D at p. 7-8, §§VI(B)(3), (B)(6)(b).  If the individual still refuses to leave, then the Casino staff contacts law enforcement, and a reasonable number of security guards contain the individual.  Id., Exhibit D at p. 8, §VI(B)(7)(a-b).  The use of force is prohibited unless it is "to defend yourself, others, or property from harm, and then only the degree of force which is **necessary and reasonable** to such defense may be used."  Id., Exhibit D at p. 9, §VI(C)[emphasis in original].  Those procedures were in place when the Plaintiff was removed from the

---

[19]The Casino is operated on the Band's reservation in Duluth, Minnesota.  See, Casino Defendants' Memorandum in Support, supra at 2.

Casino, and when he was detained on the sidewalk outside of the Casino.  See, <u>Casino Defendants' Memorandum in Support</u>, supra, Exhibit D at 10.

Since the Casino Defendants were acting pursuant to tribal authority, when they ejected the Plaintiff from the Casino and restrained him on the sidewalk, the Plaintiff cannot properly sustain a Section 1983 claim against them.  See, <u>Burrell v. Armijo</u>, supra at 1174; <u>E.F.W. v. St. Stephen's Mission Indian High School</u>, 264 F.3d 1297, 1305 (10th Cir. 2001)(finding that the plaintiff had failed to state a Section 1983 claim where the plaintiff's nonconclusory allegations concerned tribal law); <u>Evans v. McKay</u>, 869 F.2d 1341, 1347 (9th Cir. 1989)("[A]ctions "under section 1983 cannot be maintained in federal court for persons alleging a deprivation of constitutional rights under color of tribal law."), amended on denial of reh'g, 953 F.2d 1386 (9th Cir. 1992), citing <u>R.J. Williams Co. v. Fort Belknap Housing Authority</u>, supra at 982.

Accordingly, we conclude that we lack subject matter jurisdiction over the Casino Defendants, and we recommend that their Motion to Dismiss be granted.[20]

-----

[20]The Plaintiff has alleged that Urness subjected him to employment discrimination in the Plaintiff's attempts to secure employment with the Band.  See, <u>Amended Complaint</u>, supra at 13.  However, we have determined that we are without subject matter jurisdiction over the Plaintiff's claims, as they have been alleged in the context of Section 1983, which is the only claim that the Plaintiff alleged, at least by our indulgent construction.  To the extent that the Plaintiff intended a claim under either

(continued...)

5.   <u>Tribal Sovereign Immunity</u>.  As an alternative basis for dismissal, the Casino Defendants contend that Tribal sovereign immunity bans the Plaintiff's claims.  "Indian tribes are considered 'domestic dependent nations' which 'exercise inherent sovereign authority over their members and territories."  <u>Altheimer & Gray v. Sioux Mfg. Corp.</u>, 983 F.2d 803, 812 (7th Cir. 1993), cert. denied, 510 U.S. 1019

---

[20](...continued)
Title VII, or the Americans with Disabilities Act ("ADA"), each statute excepts an Indian tribe as an employer, and therefore, Indian tribes are not subject to those Acts. See, <u>Charland v. Little Six, Inc.</u>, 112 F. Supp.2d 858, 865 (D. Minn. 2000), aff'd, 13 Fed.Appx. 451 (8th Cir., June 27, 2001), citing <u>Title 42 U.S.C. §2000e</u>, and <u>Title 42 U.S.C. §12111(5)(B)(i)</u>.  While there is no allegation which would implicate Title VII, the ADA, or the Age Discrimination in Employment Act, Title 29 U.S.C. §621, <u>et seq.</u>, for that matter, plainly, none of the Casino's employees, who are named Defendants here, were employers, and we simply note that, under any notion of agency, or aiding and abetting, those employees could not be subject to the Plaintiff's Federal discrimination claims, however characterized.  Nor is there jurisdiction for any such claims under Title 28 U.S.C. §1343.  <u>Id.</u> at 866.  Lastly, the Casino, and correlatively, its employees, are also immune from suit, under the Minnesota Human Rights Act ("MHRA").  See, <u>Setchell v. Little Six, Inc.</u>, 1996 WL 162560 at *1 (Minn.App., April 9, 1996), pet. for rev. granted (Minn., July 10, 1996), cert. denied, 521 U.S. 1124 (1997).  In any event, as we later detail, even if tribal immunity did not here apply, we would recommend that supplemental jurisdiction over any MHRA claim be declined.

The Casino Defendants also contend that they are entitled to dismissal of the Plaintiff's claims because he failed to exhaust his Tribal Court remedies.  On the basis of this Record, however, we are unable to ascertain whether the Plaintiff has exhausted his remedies.  However, since we have determined that we lack subject matter jurisdiction over the Plaintiff's claims against the Casino Defendants, we do not consider that argument further.

- 62 -

(1993), quoting Oklahoma Tax Com'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 508 (1991). "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." Smith v. Babbitt, 875 F. Supp. 1353, 1359 (D. Minn. 1995), aff'd, 100 F.3d 556 (8th Cir. 1996), cert. denied, 522 U.S. 807 (1997), citing Santa Clara Pueblo v. Martinez, supra at 58 (1978)[other citations omitted].

Tribal sovereign immunity is not absolute, however, as recognized by the Supreme Court.  See, Santa Clara Pueblo v. Martinez, supra at 58 ("This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress," and "without congressional authorization, the Indian Nations are exempt from suit.").  "A tribe may [also] waive its immunity, but such waiver 'cannot be implied but must be unequivocally expressed.'"  Rosebud Sioux Tribe v. Val-U-Const. Co. of South Dakota, Inc., 50 F.3d 560, 562 (8th Cir. 1995), cert. denied, 516 U.S. 819 (1995), quoting Santa Clara Pueblo v. Martinez, supra at 58; see, Auto-Owners Ins. Co. v. Tribal Court of the Spirit Lake Indian Reservation, 495 F.3d 1017, 1020 (8th Cir. 2007)("Even if an Indian tribe waives its sovereign immunity, such a waiver does not automatically confer jurisdiction on federal courts."), citing Weeks Constr. Inc. v. Oglala Sioux Housing Auth., 797 F.2d 668, 671-72 (8th Cir. 1986).

As a result, absent either a clear waiver of immunity by the Tribe itself, or congressional abrogation of that immunity, Tribes are immune from suit. Ultimately, we adhere to a "'strong presumption' in favor of tribal sovereign immunity." Smith v. Babbitt, supra at 1359, quoting Pan Am. Co. v. Sycuan Band of Mission Indians, 884 F.2d 416, 418 (9th Cir. 1989).

Further, "[a] tribe's sovereign immunity extends to its agencies." Ferguson v. SMSC Gaming Enterprise, 475 F. Supp.2d 929, 930-31 (D. Minn. 2007), citing Hagen v. Sisseton-Wahpeton Community College, 205 F.3d 1040, 1044 (8th Cir. 2000); see also, Dillon v. Yankton Sioux Tribe Housing Auth., 144 F.3d 581, 583 (8th Cir. 1998). In addition, "[t]he tribe's sovereign immunity also may extend to tribal officials in their official capacity, provided the tribe had the authority to take the action it delegated to the official." Ferguson v. SMSC Gaming Enterprise, supra at 931, citing Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1471 (8th Cir. 1994) (finding that, if the Tribe had the power to enact the law, then "the tribal officers are clothed with the Tribe's sovereign immunity[.]"), and Northern States Power Co., v. Prairie Island Mdewakanton Sioux Indian, 991 F.2d 458, 460 (8th Cir. 1993); see also, Native American Distributing v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1296 (10th Cir. 2008)("[A] tribe's immunity generally immunizes tribal officials from claims made

- 64 -

against them in their official capacities."); Cook v. AVI Casino Enterprises, Inc., 548 F.3d 718, 727 (9th Cir. 2008)("Tribal sovereign immunity 'extends to tribal officials when acting in their official capacity and within the scope of their authority.'"), quoting Linneen v. Gila River Indian Community, 276 F.3d 489, 492 (9th Cir. 2002), cert. denied, 536 U.S. 939 (2002); Tamiami Partners, Ltd. ex rel. Tamiami Development Corp. v. Miccosukee, 177 F.3d 1212, 1225 (11th Cir. 1999), cert. denied, 529 U.S. 1018 (2000).

In Ferguson, the plaintiff, a former casino employee, brought an employment discrimination action under Title VII, Title 42 U.S.C. §§2000e, et seq., against, his former employer, SMSC Gaming Enterprise, which operated Mystic Lake Casino, and against Whitley, his former supervisor, who had terminated the plaintiff's employment. See, Ferguson v. SMSC Gaming Enterprise, supra at 930. As a threshold matter, the Court determined that SMSC Gaming Enterprise was entitled to sovereign immunity, as an agency of the Tribe. Id. at 931. As a result, the Court also concluded that the plaintiff's official capacity claims against Whitley were also barred by sovereign immunity, because the plaintiff's claims were essentially claims against the Tribe. Id., citing Kentucky v. Graham, supra at 165. The Court observed that "[i]t is undisputed that the tribe had the power to terminate plaintiff's employment," and

"[t]herefore, the tribe's sovereign immunity protects its official, Whitley, who took that action on the tribe's behalf."  Id.

As we have already observed, the Band had inherent authority to ban the Plaintiff from tribal properties.  Furthermore, the Band had created a set of procedures for its Casino staff to follow when an unwanted individual was on the Casino's property.  See, Casino Defendants' Memorandum in Support, supra, Exhibit D.  Here, the Casino Defendants were enforcing the ban against the Plaintiff, on the Tribe's behalf, when they removed the Plaintiff from the Casino's property, and accordingly, they are entitled to the Tribe's sovereign immunity with respect to the Plaintiff's official capacity claims against them.  See, Baker Elec. Coop., Inc. V. Chaske, supra at 1471; Northern States Power Co., v. Prairie Island Mdewakanton Sioux Indian, supra at 460; Ferguson v. SMSC Gaming Enterprise, supra at 931.

Nonetheless, the Casino Defendants are not entitled to Tribal sovereign immunity for the Plaintiff's individual capacity claims against them, because the Plaintiff has alleged that they acted with excessive force when they ejected him from the Casino's property.  See, Ferguson v. SMSC Gaming Enterprise, supra at 931 ("To state a claim against Whitley in his individual capacity, plaintiff must allege facts suggesting that Whitley did not act on the tribe's behalf, or exceeded the authority

granted to him by the tribe."); <u>United States ex. rel. Shakopee Mdewakanton Sioux Community v. Pan American</u>, 650 F. Supp. 278, 281 (D. Minn. 1986)("Sovereign immunity does not bar a suit against individuals for acts committed or statements made by them in their individual capacities."); see also, <u>Native American Distributing v. Seneca-Cayuga Tobacco Co.</u>, supra at 1296 ("The general bar against official-capacity claims, however, does not mean that tribal officials are immunized from individual-capacity suits arising out of actions they took in their official capacities[.]"); <u>Fletcher v. United States</u>, 116 F.3d 1315, 1324 n. 12 (10th Cir. 1997)("Tribal sovereign immunity does not protect an official against individual capacity claims."), citing <u>Santa Clara Pueblo v. Martinez,</u> supra at 59; <u>Breakthrough Management Group, Inc. v. Chukchansi Gold Casino and Resort</u>, 2007 WL 2701995 at *7 (D.Colo., September 12, 2007)("[S]overeign immunity does not protect tribal employees against claims asserted against them in their individual capacities."), denying reconsideration, 2008 WL 3211286 (D. Colo., August 6, 2008). Accordingly, if we have subject matter jurisdiction over the Plaintiff's claims -- which we have expressly concluded we do not -- we would recommend, in any event that the Plaintiff's claims against the Casino Defendants be dismissed, based upon sovereign immunity, to the extent that he sues the Casino Defendants in their official capacities,

and we recommend that the individual capacity claims be dismissed for want of subject matter jurisdiction.

     E.    <u>The Plaintiff's State Law Claims</u>.   In his Amended Complaint, the Plaintiff also alleges one (1) State law claim for negligence.   See, <u>Amended Complaint</u>, supra at 8-9, 13.  The negligence claim is alleged against Helgemoe and Tinsley, based upon their alleged failure to ensure that he received proper medical care.  <u>Id.</u> at 8.   Inadequate medical care can sustain a claim under the Eighth Amendment, if the Plaintiff can demonstrate that Helgemoe, and Tinsley, were each deliberately indifferent to his medical needs.  See, <u>Senty-Haugen v. Goodno</u>, 462 F.3d 876, 889 (8th Cir. 2006), cert. denied, 549 U.S.1348 (2007); <u>Gibson v. Weber</u>, 433 F.3d 642, 646 (8th Cir. 2006); see also, <u>Roe v. Crawford</u>, 514 F.3d 789, 798 (8th Cir. 2008)("'To prevail on an Eighth Amendment claim of deliberate indifference to serious medical needs, an inmate must prove that he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs.'"), cert. denied, --- U.S. ---, 129 S.Ct. 109

(2008), quoting, <u>Hartsfield v. Colburn</u>, 491 F.3d 394, 396-97 (8th Cir. 2007), cert.

denied, --- U.S.---, 128 S.Ct. 1745 (2008)[citation omitted].[21]

Here, however, the Plaintiff has alleged only that Helgemoe, and Tinsley, were

negligent, which is insufficient to support any constitutional claim based on

inadequate medical care. See, <u>Popoalli v. Correctional Medical Services</u>, 512 F.3d

488, 499 (8th Cir. 2008)("For a claim of deliberate indifference, 'the prisoner must

show more than negligence, more even than gross negligence, and mere disagreement

with treatment decisions does not rise to the level of a constitutional violation.'"),

quoting <u>Estate of Rosenberg v. Crandell</u>, 56 F.3d 35, 37 (8th Cir. 1995); <u>Moore v.

Duffy</u>, 255 F.3d 543, 545 (8th Cir. 2001)("[M]edical negligence does not violate the

---

[21]However, since the Plaintiff was not a prisoner during the alleged Eighth Amendment violation, his claims are more appropriately analyzed under the Fourteenth Amendment, but such an analysis would reach the same result as that under the Eighth Amendment. See, <u>Frentzel v. Boyer</u>, 2008 WL 4737102 at * 1 (8th Cir., October 30, 2008); <u>Maddox v. Davis</u>, 164 Fed.Appx. 559, 560-61 (8th Cir. 2005); <u>Hartsfield v. Colburn</u>, 371 F.3d 454, 457-58 (8th Cir. 2004). Nonetheless, under either the Eighth or Fourteenth Amendment, a plaintiff must prove that the defendants were deliberately indifferent to his need for medical care. See, <u>Frentzel v. Boyer</u>, supra at * 1("Because Frentzel was a pretrial detainee, his constitutional claims based on inadequate medical care arose under the Fourteenth Amendment, but we apply the Eighth Amendment deliberate-indifference standard."); <u>Senty-Haugen v. Goodno</u>, supra at 889 ("Although this claim thus falls under the due process clause of the Fourteenth Amendment, the deliberate indifference standard remains applicable."); <u>Ervin v. Busby</u>, 992 F.2d 147, 150 (8th Cir. 1993), cert. denied, 510 U.S. 879 (1993).

Eight Amendment"), citing <u>Roberson v. Bradshaw</u>, 198 F.3d 645, 647 (8th Cir. 1999) ("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.").  Therefore, we find, with respect to the alleged inadequate medical treatment claim, that the Plaintiff has failed to state any Federal constitutional claim.  Accordingly, the Plaintiff has stated no more than a State law claim for negligence.

As our Court of Appeals recently explained, in <u>Gilson v. Weber</u>, 433 F.3d 642, 647 (8th Cir. 2006):

> Under 28 U.S.C. §1367(c)(3), a court may "decline to exercise supplemental jurisdiction over a claim * * * [if] the district court has dismissed all claims over which it has original jurisdiction."   Congress unambiguously gave district courts discretion in 28 U.S.C. §1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed, and there is no basis to find an abuse of discretion here.  See Labickas v. Arkansas State University, 78 F.3d 333, 334 (8th Cir. 1996); McLaurin v. Prater, CO-1, 30 F.3d 982, 985 (8th Cir. 1994).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims."  <u>Barstad v. Murray County</u>, 420

F.3d 880, 888 (8th Cir. 2005), quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343,

350 n. 7 (1988).

Accordingly, because we find no violation of the Plaintiff's constitutional rights

arising under Federal law, and because we have recommended either the Dismissal of

those claims, or Summary Judgment in favor of the Defendants, we further

recommend that the Court decline to exercise supplemental jurisdiction over the

Plaintiff's purely State law claims.

F.      <u>The Plaintiff's Motions</u>.

Lastly, we briefly address the Plaintiff's outstanding Motions. First,

because we recommend the dismissal of all the Plaintiff's claims, we also recommend

that the Plaintiff's cross-Motion to Dismiss be denied, as moot.

Next, we recommend that the Plaintiff's Motion for the Entry of Default be

denied. According to Rule 55(a), Federal Rules of Civil Procedure, "[w]hen a party

against whom a judgment for affirmative relief is sought has failed to plead or

otherwise defend as provided by these rules, and the fact is made to appear by

affidavit or otherwise, the clerk must enter the party's default." A Judgment of default

may, thereafter, be entered on application to the Court. See, <u>Rule 55(b), Federal Rules</u>

<u>of Civil Procedure; Johnson v. Dayton Electric Manufacturing Co.</u>, 140 F.3d 781, 783

(8th Cir. 1998)("When a party 'has failed to plead or otherwise defend' against a pleading listed in Rule 7(a), entry of default under Rule 55(a) must precede grant of a default judgment under Rule 55(b)."); United States v. Woods, 2004 WL 790332 at *3 (D. Minn., March 31, 2004)("Rule 55(b)(2) commits the entry of a default judgment to the discretion of the district court."), citing FTC v. Packers Brand Meats, Inc., 562 F.2d 9, 10 (8th Cir. 1977); see also, Harris v. St. Louis Police Dep't, 164 F.3d 1085, 1086 (8th Cir. 1998).

When determining whether a Default Judgment is appropriate, the Court must consider whether the assertedly defaulting party has filed a responsive Answer, or other pleading, prior to an entry of Default Judgment. See, Johnson v. Allied Interstate Inc., 2002 WL 1906024 at *2 (D. Minn., August 19, 2002)("Although the entry of a default against Allied would have been warranted as of the date Johnson brought her motion for default judgment, no default was entered on the docket pursuant to Rule 55(a), and the Court cannot ignore the fact that an Answer has now been filed and Allied is prepared to defend the lawsuit on the merits.").

Here, the Plaintiff contends that the Casino Defendants failed to file an Answer, or otherwise respond to his Complaint, within twenty (20) days of service, as required by  Rule 12(a)(1)(A), Federal Rules of Civil Procedure, ("[A] defendant shall serve

an answer * * * within 20 days after being served with the summons and complaint.").
On March 31, 2008, we directed the Plaintiff to serve the Casino Defendants with an Amended Summons and Complaint.  See, <u>Docket No. 86</u>.  The Plaintiff effected service on April 24, 2008, and accordingly, the Casino Defendants were required to file, and serve, a responsive pleading by no later than May 14, 2008.  See, <u>Docket No. 105</u>.  In lieu of an Answer, and as permitted by Rule 12(b), Federal Rules of Civil Procedure, the Casino Defendants filed a Motion to Dismiss on May 5, 2008, nine (9) days before any response was required under the Rules.  See, <u>Docket No. 108</u>.  Since the Casino Defendants have demonstrated their intention to defend against the Plaintiff's claims, and because their Dispositive Motion was timely filed, we recommend that the Plaintiff's Motion for Entry of Default Judgment be denied.

Lastly, the Plaintiff has filed a Motion for the Appointment of Counsel.  See, <u>Docket No. 131</u>.  We have previously denied the Plaintiff's Motion to Appoint Counsel, see, <u>Docket Nos. 23, 65</u>, and here, he has not provided any new information that would change our previous analysis.  In addition, we have recommended the dismissal of all of the Plaintiff's claims, and accordingly, we recommend that his renewed Motion for the Appointment of Counsel be denied, as moot.

NOW, THEREFORE, It is  –

- 73 -

RECOMMENDED:

1.     That the Duluth Defendants' Motion to Dismiss [Docket No. 95] be granted, or that they be granted Summary Judgment as to those claims we have identified, in the text of this Report, as warranting that relief.

2.     That the Casino Defendants' Motion to Dismiss [Docket No. 108] be granted.

3.     That the Plaintiff's Motion to Dismiss [Docket No. 116] be denied, as moot.

4.     That the Plaintiff's Motion for Entry of Default [Docket No. 131] be denied.

5.     That the Plaintiff's Motion to Appoint Counsel [Docket No. 132] be denied, as moot.

Dated:  February 10, 2009                    s/Raymond L. Erickson
                                             Raymond L. Erickson
                                             CHIEF U.S. MAGISTRATE JUDGE

NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 2, 2009,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 2, 2009,** unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.